### TEXAS & PACIFIC RY. CO. v. CONSOLIDATED COMPANIES, Inc.*

#### No. 1240.

Court of Appeal of Louisiana. First Circuit.

Dec. 4, 1933.

Carville & Carville, of Plaquemine, for appellant.

Borron, Owen & Borron, of Plaquemine, for appellee.

ELLIOTT, Judge.

 Texas & Pacific Railway Company claims of Consolidated Companies, Inc., an undercharge of $100.74 on a shipment of freight. An exception of vagueness, filed by defendant, not urged in its brief, will be looked on as having been abandoned. Defendant also filed against the plaintiff an exception that its action was barred by the prescription of two years provided for by Act No. 223 of 1914. The minutes show that this exception, upon defendant's motion was referred to the merits. It is not urged in brief, so we look on it as having been abandoned.

The defendant answered plaintiff's demand, denying same, but, in the main, admitting its averments of fact, except the alleged indebtedness, which it denied. The case was submitted to the court on an agreed statement of facts. The court rendered judgment rejecting plaintiff's demand, and the plaintiff has appealed.

Consolidated Companies, Inc., ordered from Saginaw Milling Company, Saginaw, Mich., a carload of beans to be shipped to it at Napoleonville, La. The shipment was consigned order Saginaw Milling Company, notify Consolidated Companies, Inc., at Napoleonville, La. The original routing instructions given by Saginaw Milling Company to Pere Marquette Railway Company, the initial carrier, were Pere Marquette, Clover Leaf, Missouri Pacific, and Texas & Pacific. These instructions were given on November 2, 1927. On November 3, 1927, while the car was still in the possession of the Pere Marquette Railway Company at Saginaw, Mich., within its yards, and before it had commenced to move on its journey, Saginaw Milling Company requested of Pere Marquette Railway Company a change of routing to Pere Marquette, Clover Leaf, Missouri Pacific, and Southern Pacific. As just stated, the car in question had not, at this time, left the yards of the Pere Marquette Railway Company at Saginaw, Mich. It did not in fact leave its yards until about

*Rehearing denied January 22, 1934. Writ of certiorari granted February 26, 1934.

5 o'clock p. m. November 3d, and remained in its possession until 4:35 a. m. November 4, 1927. This request was made to the proper agent of the Pere Marquette Railway Company. It was received on November 3, 1927, at about 1:30 p. m. The agent of the Pere Marquette Railway Company acknowledged the receipt of the request on the same day and assured Saginaw Milling Company, in writing, that the change would be made, delivering to Saginaw Milling Company at the same time a copy of the transit waybill, showing that the change had been made.

The original bill of lading had at this time been mailed to Napoleonville, La., with sight draft on Consolidated Companies, Inc., attached. The bill of lading was not surrendered. No notation of a change in route was indorsed thereon and no bond was given in lieu thereof. At about 4:35 a. m. November 4, 1927, the shipment reached the junction point of Pere Marquette with the Clover Leaf Railway. ·The stipulated route was followed, except, instead of being transferred from Missouri Pacific to the Southern Pacific, it was transferred to the Texas & Pacific, and was, by the Texas & Pacific carried to its destination.

■ If the car had been delivered by the Missouri Pacific to the Southern Pacific, as the transit waybill required, the freight would have been $288.15. Over the Texas & Pacific it was $388.89, a difference of $100.74, the amount claimed in the petition. The shipment being interstate, the acts of Congress and rules and regulations of the Interstate Commerce Commission govern as to the rights of the parties.

■ We do not understand the plaintiff to contend that the shipper could not change the routing when it discovered the advantage in rate, and that the request was not timely made, consented to, and actually made by the initial carrier, but its contention is that the original routing could not be changed, because the shipper did not surrender to the initial carrier the original bill of lading for indorsement or exchange, and, if that be not done, then give an indemnity bond or other approved security.

The freight tariff of the Pere Marquette Railway Company contains the following provision: "For the purpose of applying these rates the term 'diversion' means: (d) A change in the route at the request of the consignor, consignee or owner."

Under the term "Conditions" it contains the following: "The services herein authorized are subject to the following conditions: 'Except as provided in note 4 of Rule 16 on shipments consigned to order, original bill of lading should be surrendered for endorsement or exchange or in its absence satisfactory bond or indemnity executed in lieu thereof or other approved security given at the time the diversion order is placed." The pro-

vision contained under note 4 of Rule 16 has no apparent bearing on the question involved in the present case. Of course the new route must be one provided for by the tariffs of the initial carrier and recognized and approved by the Interstate Commerce Commission. In this instance the route substituted for the original one was provided for by the tariffs of the initial carrier and had the approval of the Interstate Commerce Commission.

The only question that plaintiff urges against the change is that the bill of lading was not surrendered when it was made. The facts show that the bill of lading had already been mailed, addressed to the consignee, at Napoleonville, La. In this case if the original bill of lading had been surrendered, the surrender would not have prevented the route over the Texas & Pacific, because a shipment is not regulated in the matter of route by the bill of lading, but by the transit waybill. The bill of lading, had it been surrendered, and the new route indorsed on it, would then have been put back in the envelope and mailed to the consignee at Napoleonville, La. The transit waybill showed the new route, and the conductors of the various lines should have been governed accordingly.

The word "should" in the rule which the plaintiff invokes is directory. Being directory, a deviation is excusable under proper circumstances. If the rule had said that the bill of lading *must* be surrendered before any change can be made, then the mandate would have required absolute obedience; but, being directory, the shipper was not bound to surrender the bill of lading, and the initial carrier was not bound to insist on the surrender as a prerequisite to changing the route. The bond or other security which the rules provide for when the bill of lading is not surrendered, is for the protection of the carrier. In Swindler v. Texas & Pacific Railway Co., 5 La. App. 641, the route taken was the one which the shipper and initial carrier intended it should take, and it was taken. In that case the shipper was misinformed by the railroad's agent as to the rates which would be applied. The Swindler Case quotes and is based on La. Ry. & Nav. Co. v. Holly, 127 La. 615, 53 So. 882, 883. In that case the Supreme Court says: "A railroad is prohibited from charging any less freight on interstate traffic than is prescribed by the Interstate Commerce· Commission for the route over which the shipment has actually been carried." But the court has reference to a route over which the shipment was actually routed. The court, we do not think, has in mind a case like the present, where the shipment has been carried over a route contrary to the intentions of the shipper and initial carrier and contrary to the instructions contained in the transit waybill.

The judgment appealed from is in our opinion correct. Judgment affirmed; plaintiff and appellant to pay the costs in both courts.